HENRY POWLES, GEORGE W. HYDE AND OTHERS, *vs.* JO-
SEPH DILLEY, BARNEY DILLEY, BENJAMIN R. EDWARDS,
AND THE MERCHANTS FIRE INSURANCE COMPANY.—
*December* 1850.

The common law has always sanctioned the right of one creditor to obtain
the payment, or security of his debt, from the debtor, to the exclusion of
other creditors.

To render a transfer to a favored creditor void under the insolvent system,
the debtor must intend both to apply for the benefit of the insolvent laws,
and intend to prefer the particular creditor or creditors; the guilty intent
must concur in both particulars.

To ascertain this intent, all the facts and circumstances surrounding the case
must be brought into view, and the court are as free to infer it from cir-
cumstances, as if it had been expressed by the party.

But the inference must be a fair and justifiable one from all the facts; one
that leaves no doubt in the mind, that the party at the time contemplated
an application for the benefit of the insolvent laws; and it is incumbent
on the complainant to establish this motive where it is denied by the
answer.

Where an assignment is assailed as a fraud upon the insolvent laws, the de-
clarations of the parties to it, made at the time, showing that it was only
executed after urgent persuasions on the part of the creditor, are admissi-
ble as part of the *res gesta*, to explain the motives and circumstances sur-
rounding the assignment.

The rule, with but an occasional exception, is well established and of long
standing, that the answer of one co-defendant is not to be received *against*
another, because if the complainant wishes to establish a fact by the evi-
dence of one defendant, he may examine him as a witness, which will
afford the co-defendant an opportunity of a cross-examination.

But where the complainant calls upon a defendant to answer, he makes the
latter a witness, and so far as the answer is responsive to the bill, it must
be received against the complainant, and it cannot be excluded because
there is a co-defendant in whose *favor* it may and does consequentially
operate.

A party who cites a witness and examines him, is not at liberty to reject his
testimony afterwards.

It is no objection to the validity of this assignment that it was made after the
filing of a former bill, against the same parties, which was subsequently
dismissed, and the existence of which was not known to the parties until
after the assignment was made, which was done before the institution of
the present suit.

Where a trustee, in two characters, has the means of committing fraud, as

trustee and purchaser both, a court of equity will interpose, and not compel the party to wait until the mischief is done.

If property in the hands of an insolvent trustee is not secure, and is about to be wasted and applied by the trustee to his own use, a court of equity may interfere to prevent the abuse of the trust, until the proper remedy can be applied, provided the mischief be irreparable, or the consequences of such a character as to be without relief, except in equity.

But where there is adequate remedy pointed out by law, equity will not interfere; more especially where the party sought to be affected by the proceeding, derives his power under a special jurisdiction, and is made responsible to that jurisdiction for the exercise of his trust.

The court of chancery has no jurisdiction over the appointment and removal of trustees of insolvent debtors, the whole subject being regulated by statutes, and resting with the courts of law.

The whole adminsitration of the insolvent's assets, is confided exclusively to the courts of law.

The authority of a court of competent jurisdiction, when coming incidentally in question, is conclusive of the matter decided, and cannot be impeached on the ground of *informality* in the proceedings, or mistake or error in the matter on which they have adjudicated.

Where the question of the appointment of an insolvent trustee arises incidentally in other courts, it is not competent there to inquire, whether he was rightfully appointed or not.

APPEAL from the *Court of Chancery*.

This appeal was taken by the appellants, creditors of *Barney Dilley* and *Benjamin R. Edwards*, two of the appellees, from an order of the chancellor passed on the 13th of March 1849, dissolving an injunction and dismissing the bill of the appellants, which they had filed for the purpose of vacating an assignment of a policy of insurance, of the *Merchants Fire Insurance Company*, made by *Edwards* to *Joseph Dilley*, the other appellee, as fraudulent under the statute of 13*th Elizabeth*, or the insolvent laws of this State.

The allegations of the bill and answers, and all the pleadings and facts of the case, are stated in the opinion of this court, delivered by his honor *Judge Frick*. The opinion of the chancellor, (JOHNSON,) delivered upon the passing of the order appealed from, is reported in 2 *Md. Chancery Decisions*, 118.

The cause was argued before SPENCE, MAGRUDER, MARTIN and FRICK, J.

S. T. WALLIS for the appellants, made the following points:

1st. That there is no competent or sufficient evidence of any original agreement, on the part of *Edwards and Dilley*, to give to *Joseph Dilley*, any lien upon their stock in trade.

2nd. That even if there be any such evidence of an agreement, it does not apply to the stock in trade which was burned, and which the policy secured, and can furnish no foundation or consideration, for the alleged transfer of that policy, and its proceeds to *Joseph Dilley*, at the time and under the circumstances, when the same is alleged to have taken place.

3rd. That the agreement so attempted to be set up, was, if made at all, a fraud, or a secret equity, which cannot be recognized or enforced as against subsequent creditors.

4th. That the alleged assignment of the policy to *Joseph Dilley*, was made by *Edwards*, *post litem motam*, when he was insolvent, and was by said *Dilley* known to be so, and that it was a fraudulent preference under the insolvent laws.

5th. That the alleged assignment was void as not *bona fide*, under the statute of *Elizabeth*, and our insolvent laws, being to hinder and defraud creditors, and likewise to secure and obtain benefits for *Edwards* from *Dilley*.

6th. That the whole proceedings of *Edwards* and *Dilley*, in regard to the policy, its alleged transfer, the insolvent application of *Edwards*, and the appointment of *Dilley* as his trustee, constitute a fraud in fact, and were the result of fraudulent combination.

7th. That the answers of *Barney Dilley* and *Edwards*, are not evidence for *Joseph Dilley*.

8th. That the statements of *M. T. Evans*, in his testimony, in regard to the declarations of *Edwards*, and the conversations of that witness with, him, were inadmissible as evidence.

9th. That it is competent for chancery, under the circumstances of this case, to interfere and remove an insolvent's permanent trustee, who has become such fraudulently, pending proceedings in chancery, whereby jurisdiction has been acquired over the distribution of the insolvent's assets, and where-

Powles, *et al.*, *vs.* Dilley, *et al.*—1850.

to the party so becoming trustee, is a party claiming an interest; such an appointment, so procured, being a device to oust the jurisdiction of chancery, and to acquire indirectly a right to the very possession of assets, which is the subject of the chancery controversy.

10th. That, even if chancery has no right to remove the permanent trustee of an insolvent, or to appoint another, it has unquestionable jurisdiction over him, so far as to adjudicate, as between him and the other creditors, the right to the custody and ownership of any part of the assets, which he claims to hold in his own right, and adversely to the other creditors. Such jurisdiction is a part of the recognized chancery control over all trusts and their administration, and affords to the creditors, who deny the individual right set up by the trustee, their only mode of litigating the question, the legal title to hold and to sue, being in the very party whose pretensions are impeached. In the present case it will be contended, that the jurisdiction is aided by the allegation and proof of fraud in the trustee, though it exists independently of fraud, and of any such irregularity in the appointment or conduct of the trustee, as would justify his removal by the county court, sitting in insolvency.

11th. That under the acts of Assembly, *Edwards* had no right to apply in *Allegany* county; that the proceedings there were *coram non judice*, and that *Dilley* has no standing in court, as permanent trustee of *Edwards*, his alleged appointment not being legal, or by a court of competent jurisdiction.

WM. F. FRICK and McKAIG, for the appellees, contended:

1. That the assignment in question was not fraudulent, under the statute of 13 *Elizabeth;* but *bona fide,* and for a valuable consideration.

2. That the same was not fraudulent under our insolvent system: 1st. Because it is not proved, that *Edwards* was insolvent in fact when he made the assignment; nor that it was made by him with a view, or under an expectation, of taking the benefit of the insolvent laws. 2nd. Because it was not an undue and improper preference; it being in proof that it was

made in compliance with an engagement to secure *Dilley;* and further, that it was involuntary, and made upon *Dilley's* urgent request and demand.

3. That there was neither fraud, in fact or in law, in the making of the assignment by *Edwards*, or its receipt by *Dilley;* nor in any of their subsequent proceedings in the case.

4. That the assignment was not made, *post litem motam;* and that the answers and all the other evidence in the case, are sufficient and competent to prove the fact of the assignment, the time, the consideration, and the circumstances of its execution, and its validity.

5. That the answers of *Barney Dilley* and *Edwards* are evidence for *Joseph Dilley* against the complainants.

6. That the complainants have no standing in court to impeach the assignment in question; because, if in fraud of the insolvent system, the permanent trustee of the insolvent can alone avoid it.

7. That the application of *Edwards* in insolvency was regular and lawful; and the appointment of *Dilley* as his trustee, also legal and proper.

8. That the court of chancery has no jurisdiction in the appointment and removal of trustees of insolvents, the same resting with the courts of law, and the whole subject matter being governed by statute; and that it has therefore no power to remove *Dilley*, on the ground alleged, that his appointment was improper.

9. That the court of chancery cannot adjudicate the right to the policy in question, between the complainants and *Dilley*, either in his own right, or as the trustee of *Edwards*, in the present proceedings; the same having been improperly conceived, and being erroneous and defective in many respects. And that the chancellor's decree must be affirmed.

FRICK, J., delivered the opinion of this court.

*Barney Dilley*, the infant son, and *Benjamin R. Edwards*, the son-in-law of *Joseph Dilley*, the appellee, on the 11th of January, 1844, commenced business in the town of *Cumber-*

*land,* under the name of *Edwards and Dilley,* and in the course of the autumn of that year, became indebted to the complainants and others, for goods purchased in the prosecution of their business.

They had originally obtained from the *Merchants Fire Insurance Company* of *Baltimore,* an insurance upon their stock in trade, to the amount of $3000, and at the expiration of the policy, on the 17th of February, 1845, *Barney Dilley* having in the meantime withdrawn from the concern, upon notice to the creditors, that being a minor he was not responsible for any of the business transactions of the firm, *Edwards* procured a renewal of the policy, and continued the business in his own name.

Very soon after, on the 13th of March, a fire broke out on the premises, by which the whole stock in trade was consumed; being considerably more than was covered by the insurance; and *Edwards,* then alone interested, proceeded to *Baltimore* with a view to adjust the loss with the insurance company, and confer with his creditors.

About this period, on the 5th of April, 1845, the present complainants filed in *Baltimore* county court a bill of complaint against *Edwards and Dilley,* and the *Merchants Fire Insurance Company* alleging the insolvency of the concern, and the intention of *Edwards* to assign the policy of insurance, for the purpose of securing the claim of *Joseph Dilley,* his father-in-law, to the exclusion of the rest of his creditors, and as a proposed fraudulent preference of *Dilley.* The bill prayed for an injunction against the company, forbidding the settlement of the policy with either *Edwards and Dilley,* or *Joseph Dilley,* and for the appointment of a receiver to take possession of the effects of the concern, for the purpose of a ratable distribution of the proceeds among all the creditors.

The injunction was granted, and the case afterwards removed to the court of chancery, where upon the bill and answers, the injunction was dissolved. An appeal was taken to this court, and the chancellor's order was here affirmed on the 13th of February, 1846.

Immediately thereupon the complainants dismissed their bill, and on the 14th of February, (the next day,) filed a second bill on the equity side of *Baltimore* county court, in which they repeat substantially the averments of the former bill, with the exception that it is now charged that the assignment had been actually executed, and *Joseph Dilley* is made a party to the bill. They again pray an injunction against the payment of the money by the insurance company, and the appointment of a receiver for the same purpose of a ratable distribution of assets, as in the preceding bill.

This injunction was also granted, and upon removal of the case to the court of Chancery after answers filed, was there dissolved. Upon an appeal to this court, the order of the chancellor was again affirmed on the second of July, 1847.

A rule for further proceedings was then had, and on the 23d of December, 1847, the complainants filed a supplemental bill against *Joseph Dilley* and the *Merchants Fire Insurance Company.*

The bill states that they had recently obtained judgments against *Edwards*, (*Barney Dilley* having defeated them on the plea of minority,) and that he had eluded their executions by removing to *Kent* county, and being there pursued, had returned to *Allegany* county and applied for the benefit of the insolvent laws; that by collusion between *Edwards* and himself, *Joseph Dilley* had been appointed permanent trustee in fraud of complainants, who had no notice or knowledge of his appointment. That being charged with fraud, he was not a proper person to execute the trust. The bill then further charges, that any and every transfer of the policy or other assets, made by *Edwards* to *Joseph Dilley*, were made with a view and expectation on the part of *Edwards* of being and becoming an insolvent debtor, and with an intent to give to *Dilley* an undue and improper preference; and to hinder, delay, and defraud complainants of their just and lawful actions; and to receive benefit and advantage thereby, in fraud of the complainants and other creditors.

This bill prays the removal of *Joseph Dilley* from the trus-

teeship, and also, that the assignment of the policy of insurance and other transfers to the said *Dilley*, may be declared void, and a receiver appointed to take possession of the proceeds of the policy and other assets of the concern of *Edwards and Dilley*.

The answer of *Joseph Dilley* to this supplemental bill, admits that *Edwards* applied for the benefit of the insolvent laws in *Allegany* county, on the 14th of August, 1847; and that he was appointed permanent trustee by the court; but insists that he refused the acceptance of said trust, until pressed by his counsel to accept it, and that he has given bond for the discharge of his duty as trustee. He denies all irregularity, fraud and collusion, and insists, that if his appointment was improper, *Allegany* county court alone has the power to remove him. He further denies that *Edwards* eluded the complainants' executions, but avers that they were served, and security given for his appearance at the return day. He denies also that the assets will be wasted in his hands, &c.; and that the assignment of the policy to him was intended to give to him an undue and improper preference over other creditors; but that it was made in compliance with the original agreement set up in his former answer, and prays that it may be incorporated as part of this answer.

*Edwards*, in his answer, denies the allegation of fraud, &c. He alleges that when the firm of *Edwards and Dilley* embarked in business, *Joseph Dilley* became surety for the payment of the stock of goods purchased by them, with the agreement that the goods should always be responsible for his endorsements, and that after the fire, *Joseph Dilley* insisted that the policy of insurance should be transferred as representing the goods; and that the transfer was made at the urgent request and importunity of *Joseph Dilley*, and with no view of applying for the benefit of the insolvent laws, or of giving to him an undue and improper preference, as he expected after the assignment to continue the business with the goods saved from the fire, the debts upon the books, and the aid of friends.

*Barney Dilley*, (discharged of all liabilities by his plea of

minority,) was examined upon leave, and swears that it was distinctly understood that *Joseph Dilley* was to be secured in some way by the stock.   That it was spoken of when the firm began, and that they promised and fully intended to secure him. And his answer to the original bill is to the same purport.

The evidence of *M. T. Evans*, proves, that in April, the end of the month, or the beginning of May, 1845, after the fire, as attorney, he ,was employed by *Dilley* to procure the assignment of this policy; that he urged the matter repeatedly upon *Edwards* on the ground that *Dilley* was security for the payment of the stock, and that the policy ought to stand as his indemnity in lieu of the goods.   That *Edwards* did not deny that the firm were to have secured *Dilley* by the stock when witness mentioned it, but made various excuses; finally, however, he consented, and witness took the policy to the office of the company, to obtain their assent to the transfer, which was accordingly executed.

The testimony further shows that the entire stock of goods being in amount, $4800, with the exception of about $500 in value, were consumed by the fire; and that the debts due to the concern, amounted by the ledger to about $500, and those on the *Tailor's* book which was destroyed in the fire, amounted to $2000, of which it was assumed one-half, ($1000,) might be collected.

It is further in proof that *Joseph Dilley* was liable to pay, and had paid as surety for the firm, a sum exceeding the amount of the policy, and the matter in controversy between the parties now is, the validity of this assignment from *Edwards* to *Dilley* of the policy of insurance in question.

In the discussion of this case, various points were raised upon the pleadings and exceptions taken to evidence, which so far as material to a correct understanding and decision, we shall advert to when they properly arise in the course of our examination of the case.

We are first to examine whether this assignment is void under the statute of 13*th Elizabeth*, as not *bona fide*, and made to defeat, hinder and delay creditors.   The proof is abundant

that it was made for a valuable consideration; and in the relation between these parties which the evidence discloses, there is nothing to impeach the *bona fides* of the transfer at the time it is assumed to have been made. There is, moreover, nothing to indicate that he interposed to prevent the action of the other creditors. As a creditor himself to a large amount, he urged upon the party the payment or security of his own debt. It was his unquestionable right to do so, and to obtain the preference, which he sought from his debtor. The common law has always sanctioned this right of one creditor to obtain the payment or security of his debts to the exclusion of other creditors; and there is no such badge of fraud upon this assignment, or in the circumstances under which it was procured, as would authorize us to say that it was intended to hinder, delay or defeat the action of the other creditors of *Edwards;* more especially as it appears from the evidence that all his means were not exhausted, and he expected, with the aid of friends, to be able to continue his business.

But it is insisted, that if not void under the statute of *Elizabeth,* this assignment is an undue and improper preference under our insolvent laws, being made with a view and under an expectation of being or becoming an insolvent debtor, and with a view to this alleged preference of *Dilley.*

We are not to inquire how far the fire and destruction of the property in February, left *Edwards* in a state of actual insolvency or otherwise, except so far as it may have influenced his motives and his conduct to his creditors. It may or may not be true, that it rendered him actually insolvent; and yet the possession of the fund accruing from the policy, relieved from the complainants' injunction, might have enabled him to make some satisfactory arrangement to continue his business. Or he might reasonably have entertained hopes of resuming it with the assistance of his father-in-law, if he could secure to him the avails of the policy of insurance. The insolvency here in question, is that technical insolvency, which involves and contemplates an application for the benefit of the insolvent laws. He must intend both to apply and intend to prefer the

particular creditor or creditors.    And the guilty intent must concur in both particulars

To ascertain this intent, all the facts and circumstances surrounding the case, must be brought into view; and the court are as free to infer it from circumstances, as if it had been expressed by the party.    But the inference must be a fair and justifiable one from all the facts, that leaves no doubt in the mind that the party, at the time, contemplated an application for the benefit of the insolvent laws.    And it is incumbent on the complainants to establish this motive.

It is their allegation, met by the express denial of *Edwards* in his answer, that the assignment was with no view whatever to the insolvent laws, but that he expected, after the assignment, with the aid of friends, his book debts, and the goods saved from the fire, to continue his business.

In the case of *Hickley vs. the Farmers and Merchants Bank,* 5 *G. & J.,* 378, the declaration of the insolvent upon his examination was much to the same import: "that at the time of the assignment, he had not the slightest idea of taking the benefit of the insolvent laws, but hoped to be able to settle with his creditors."    The court there held: that for want of other evidence to control this declaration, the transaction must be left to its operation at common law, and being a *bona fide* assignment, and for sufficient consideration, it was sustained.

The leading fact in this cause, set up to support the charge in the bill, is the actual application of *Edwards* for the benefit of the insolvent laws, in August, 1847, more than two years after the remotest period that can be assigned for the date of the assignment, with the charge, that the intervening time had been spent by him in baffling his creditors, and postponing the application, which he must have had in view at the time of this assignment.    However plausible this construction of his conduct may seem, yet it is difficult to imagine at the same time, that he would have suffered himself to be hunted and harrassed by his creditors, through this long intervening period, merely to give color to the assignment.    And it is equally plausible and not improbable, that he awaited the adjustment

of his loss with the insurance company, which the complainants had protracted and defeated, in the hope of future and further aid from his father-in-law, to whom he had assigned the claim.

In this connection it is an important fact, that very few, if any of his engagements with the other creditors, had become due, when this assignment was executed. Yet he sought them out, came to *Baltimore* to explain the condition of his assets after the fire, and was at the time, engaged in an effort to compromise with them. He tells them, that he expected to carry on his business with the aid of friends. His father-in-law was the friend who had before assisted him, and whom he had promised to secure. As soon as it was ascertained that he proposed to do so, the bill is filed by complainants to enjoin him. The creditors themselves arrest the fund, put it out of his power to reach it, up to the present moment, and take from him the means and the aid, by which in making the assignment, he hoped to continue his business. It would seem, therefore, no overstrained inference to assume, that he only then first thought of this application, when the protracted controversy about the proceeds of his insurance obliterated all hopes of aid from that resource; and the executions pending over him, rendered this resort to the insolvent laws imperative.

But supposing the intention of the party here to be doubtful or equivocal, (which we do not,) there is yet another branch of the case, upon which the evidence is positive and conclusive. *Joseph Dilley* says, there was a preexisting engagement, to secure him in his endorsements for the firm; and *Barney Dilley's* answer and evidence confirm it. We do not mean to assert, that standing alone, such an equity can be made to support this assignment against subsequent creditors. But it was at least consideration enough to prompt *Dilley* urgently, to press a compliance, when the fire had rendered his security precarious. Thus connected with the other proof, it is consistent, and fortifies the testimony of *Evans*, that the assignment was the result of his urgent representations of this fact, and not voluntary on the part of *Edwards.* All the parties were in

30    v.9

*Baltimore* at the time, the creditors as well as *Dilley*, urging the assignment of this policy. *Evans* was employed by *Dilley*, and as his attorney and agent, for this purpose alone had several interviews with *Edwards*. He says in his testimony, that *Edwards* at first refused, and that he made various evasive excuses when first applied to; that he urged the matter repeatedly, on the ground, that *Dilley* was the security for the stock of goods insured by the policy, and that the policy ought to stand as his indemnity, in lieu of the goods; that he finally prevailed and *Edwards* agreed to execute it.

We are not unmindful that the statements of *Evans*, in regard to the declarations of *Edwards*, and the conversations with him, are objected to, as declarations between themselves, of the parties to the alleged fraud, or rather between *Edwards* on the one hand, and *Evans*, who represented *Dilley* on the other. So far as these declarations are the mere narrative of a past occurrence, it must be conceded, that they cannot be received as proof of the existence of the occurrence. 1 *Greenlf.*, *sec.* 110. But "as far as they are concomitant with the principal act," they are part of the *res gestæ*, that explain the motives and circumstances surrounding the assignment. As agent for *Dilley* he applies to *Edwards* for an assignment of this policy, and obtains it.

The validity and legality of this act, is the very issue in the cause made by the complainants. It is assailed upon the ground, that *Edwards*, at the time, had it in contemplation to apply for the benefit of the insolvent laws; and that the assignment on his part was voluntary. And supposing the complainants to have made out a case of *prima facie* intent, how is this to be repelled but by facts and declarations accompanying the act? It is not competent and proper for *Dilley* to show what took place and what was said at the time, as part of the transaction and thus bring out the co-existing influences and motive of the assignment? How is this motive to be ascertained but from the conduct and declarations of the party at the time of the act? *Evans*, although here presents one of the parties here, has no interest in the case that can disqualify him as a

witness; and his testimony as here restricted being admissible, he proves that the assignment was only executed after the repeated importunities and urgent persuasions of himself, as the agent of *Dilley;* and in this aspect of the case, it is beyond the reach of the complainants successfully to assail it.

It is said, however, that these conclusions can only be sustained by invoking the answers of *Barney Dilley* and *Edwards,* the insolvent; and that their declarations are not evidence for *Joseph Dilley.* That is to say, the answer of one defendant cannot be made to avail as evidence in favour of another defendant.

But why should the answers of these defendants be excluded from this inquiry? The complainants are here asking from each of these defendants, on oath, evidence as regards this alleged combination, and the intention of *Edwards* to evade the provisions of the insolvent laws; and they claim a discovery from each and all of them, upon the interrogatories submitted in their bill. They charge that *Edwards,* by reason of the fire, became insolvent, and that he contemplated to apply for the benefit of the insolvent laws.

He answers that he was not insolvent, that he did not intend so to apply, but had good reason to expect he would be able to prosecute his business, when he made the assignment in question. Can there be any sound reason or principle why they are not bound to take this, with the answers of the other defendants, as responsive to their bill; and as legal evidence, until re butted? It is true, as was forcibly urged on the ground of mutuality, that if *Edwards* had answered that he *did*, at the time of the assignment, *intend* to apply for the benefit of the insolvent laws, *Joseph Dilley* is not to be precluded or bound by that answer. Because the rule, with but an occasional exception, *(see* 4 *Gill*, 380,) is well established and of long standing, that the answer of one co-defendant is not to be received against another. And why not? Because if the complainant wishes to establish a fact by the evidence of one defendant, or repel the force of his answer, he may further examine him as a witness on interrogatories to that intent; which

will afford to the other co-defendants, an opportunity of cross-examination. And this rule is, in itself, just and reasonable, as it insures to both parties the privilege of examining the witness. It would appear somewhat singular, that if the rule is to be considered reciprocal, that it should now, for the first time, be urged in this court. In the case of *Sellman and Crawford, vs. Taylor,* 6 *G. & J.,* 323, the answer of *Ford,* the insolvent, is expressly invoked and used in favor of a co-defendant, without any objection being interposed; and we may fairly infer from the cases adduced in the course of the argument, that it has been the practice of the chancery court, hitherto unchallenged. The only *English* case referred to of *Bennett vs. Walker,* 1 *Dickens,* 130, where the answer of one defendant was read in evidence to support the plea of the other defendant, so far also sustains the doctrine; while it is proper to note at the same time, that the defendant in that case, refers to the answer of his co-defendant in support of his plea, and thus makes it his own.

The proposition is best tested by the sound and just rule of evidence, that neither party shall be charged by evidence, without an opportunity to examine the witness; but that a party who cites the witness and examines him, shall not be at liberty to reject his testimony afterwards. Here the evidence offered is the result of the complainant's own examination. The complainant may so shape his bill, as to make such use of the defendant as he pleases, in eliciting his evidence. Interrogatories are not a necessary part of his bill. He may call upon the defendant to answer generally, the matters charged in his bill. But if he proceeds by interrogatories, so far as they are responsive, he makes the answers evidence. If the defendant sets up new matter to defeat the equity, it is mere pleading and he must make it out by proof. But where his answer is responsive and he denies the complainant's averments, it is pleading coupled with evidence. And when a complainant as here, seeks a discovery and requires full answers to interrogatories from all the defendants, he cannot be allowed to say, that each answer is not evidence against him, whatever may be

the incidental operation of the evidence upon the other defendants. The only two *American* cases cited, expressly determine, that it is evidence in favor of all the defendants. In reference to the rule, it is said in *Mills vs. Gore, 20th Pick.*, 34, that "to admit the answer of one defendant to be evidence against the other, where a cross-examination could not be admitted, would give to the plaintiff an undue advantage against the manifest principles of impartial justice. The plaintiff might so frame his bill and interrogatories, as to elicit evidence from one defendant to charge another, and to exclude such matter as might discharge him. But where the answer is unfavourable to the plaintiff, and consequently operates favorably for co-defendants, the reason of the rule is not applicable." And the case of *Field vs. Holland,* in 6 *Cranch,* 8, is fully to the same purport: that the answer of one defendant, responsive to the bill, is evidence against the plaintiff, although the answer of one co-defendant is not testimony against another.

But assuming here the general rules upon which testimony is either received or rejected. The complainants have made *Edwards* their witness, and he has no interest in the controversy.

For if his intention to apply was expressly admitted by him, or if he conceded that the assignment was voluntary, yet such admissions could only vitiate and avoid the transfer, but would not disturb his discharge under the insolvent laws. But were it otherwise, still the complainants have made him a witness; and if his denial in his answer is received, as we have shown, it must be received, against the complainants, to contradict the allegations of their bill, how is it to be excluded, because there is a co-defendant, in whose favour the answer may and does operate, as here, consequentially?

Such a rule would give to a complainant an advantage, which it is conceived can be warranted by no just and fair principle of law or of evidence.

It is next objected against the validity of this assignment, that it was made *post litem motem*, and must be subjected to all the conditions which would attach to it, if so made after the

filing of complainants' bill of complaint, which was upon the 5th of April 1845. The testimony of *Evans*, taken literally, certainly would indicate that it was executed after that date. But connected with other facts and circumstances in evidence, it is more than probable, that there is error in the period assigned by him, as *Edwards*, and all the parties are proved to have been in *Baltimore*, in March or April, soon after the fire, and not in the latter part of April or early in May, as stated by *Mr. Evans*. The inquiry however becomes unimportant in view of the fact, that this bill was afterwards dismissed by the complainants themselves. But in addition to this, it is manifest the proceeding was never known to *Dilley* and *Edwards*, untill late in June. The bill alleging these defendants to be residents of *Allegany* county, is filed on the equity side of *Baltimore* county court; and the subpœnas made returnable in that court, on the 7th of April, (two days after) were never served. And when the injunction upon the *Fire Insurance Company*, became known to them late in June, (on the 27th,) they voluntarily appeared to the suit. There is nothing in the evidence to show that they had any earlier knowledge of these proceedings on the part of the complainants.

Whatever effect, therefore, if any, such knowledge might have had, upon a subsequent assignment of this policy, it is useless to inquire, as the testimony is conclusive, that at least, before the last mentioned date, the assignment had been executed.

But a further question has been raised here, which it becomes necessary to determine in disposing of the case. The supplemental bill filed after the application of *Edwards*, for the benefit of the insolvent laws, charges that *Joseph Dilley*, in aid of the fraud intended to be consumated by the parties, procured his own appointment as the permanent trustee of *Edwards*, under said application, and thus indirectly acquired a right to the possession of the assets; which right was and is the subject of this controversy in chancery; while at the same time the funds are not considered secure, but it is averred will be wasted in his hands, and applied to his own use and benefit. And the bill prays that *Dilley* may be removed from the ad-

ministration of the trust, and another trustee be appointed in his place, and that to save waste and misapplication of the assets, a receiver may be appointed by the court, and the assignment in question be declared void.

That cases may occur which would warrant the interposition of a court of equity, to prevent the abuse of a trust of this character, until the proper and appropriate remedy can be applied, must be readily conceded. The allegation in this bill, that the property is not secure, and will be wasted and applied by the trustee to his own use, if supported by evidence, might furnish such a case, provided the mischief were irreparable or the consequences of such a character, as to be without relief unless in equity.

Where a trustee in two characters has the means of committing fraud as trustee and purchaser both, a court of equity will interpose and not compel the party to wait untill the mischief is done. *Jeremy*, 395. But in the case before us, it is the fair and legal presumption, that the bond of the trustee executed before the proper *forum*, is adequate security against any such anticipated misfeasance, and is besides under the special control of that tribunal. In 1st *Story's Eq. Jur.*, sec. 70, it is said: "When we depart from matters of fraud, accident, mistake and account, as the foundation of a suit, in equity it is difficult to ascertain the boundary, where the right of a court of equity to entertain a bill for relief, as consequent upon the jurisdiction for discovery, begins and when it ends." And it may be safely assumed, that where there is any adequate remedy pointed out by the law, courts of equity will not interpose; more especially, where the party sought to be affected by the proceeding, derives his powers under a special jurisdiction, and is made responsible to that jurisdiction for the exercise of his trust. *Kennedy vs. Fowter*, 8 *G. & J.*, 348. Nor is this case supposed by counsel, of a conflict of jurisdiction, where by reason of the relief prayed against the alleged fraudulent assignment, the jurisdiction first attached in equity. The parties have instituted no adverse proceedings here, or in any other *forum*. To have done so, in relation to the same subject matter,

after the filing of the bill in this case, might have given some countenance to the objection.

But the parties here are passive and *Joseph Dilley* is throughout a defendant. His appointment as trustee is a legal incident and consequence of the application of *Edwards*, for the benefit of the insolvent laws; and against him in that character, the complainants have filed their supplemental bill. But can that bill draw with it the administration of this trust in chancery, where an act of Assembly, expressly delegates to another *forum* the appointment, control and removal of the trustee? The insolvent laws vest the whole property of the insolvent, in the trustee appointed by the court for the benefit of all the creditors.

If there be any conflict of rights between him and the creditors, that court has ample powers if necessary to remove him. At the same it is not so clear to us, that any such necessity exists, when *Allegany* county court has full authority to direct an account of the trust, and the assets of the estate, to be stated before them, and to determine the respective rights of the parties under this assignment. At all events the court of chancery has no jurisdiction in the appointment and removal of trustees of insolvent debtors, the whole subject being regulated by statutes and resting with the courts of law. And even if the appointment be improper or injudicious, the right to remove him by a court of equity, could not be assumed without necessarily drawing with it, the whole administration of the insolvent's assets. And that is confided exclusively to the courts of law. The objection that the complainants are turned over to another and more circuitous remedy, (if it be so,) can have no weight in determining the question. The proceeding before *Allegany* county court, before suggested, has been open to them in that *forum* from the day of his appointment. It is enough that the remedy there is ample and adequate, and we cannot regard this as a case where equity having possession of the general subject can interpose its aid by disposing of the whole matter, and thus prevent delay or multiplicity of suits. *Kennedy vs. Fowler*, 8 *G. & J.*, 340.

Finally, it is urged that under the several acts of Assembly

relating to insolvents, *Edwards* not being a resident, had no right to apply in *Allegany* county court; and that the proceedings there were *coram non judice*, and therefore *Joseph Dilley* has no standing in court as trustee of *Edwards*, the appointment, not being legal or by a court of competent jurisdiction. His resort to that unauthorized *forum*, is adduced as another fact in the alleged fraudulent combination.

There is testimony in the case, and one of the answers also admits, that *Edwards* was a resident of *Kent* county. Yet upon the face of the insolvent's papers it appears, that he is styled a resident of *Allegany* county, and throughout the proceedings upon his application he is so treated. See the case of *Barney vs. Patterson*, 6 *H. & J.*, 182. Are we at liberty to discard this record and resort to the testimony under the present proceeding, and upon that, pronounce the action of *Allegany* county court illegal and void? On the contrary the law presumes this authority to have been rightfully exercised. More especially when it comes incidentally into the case as here, it cannot be questioned. If any principle is settled, it is, that the authority of a court of competent jurisdiction, when coming incidentally in question, "is conclusive of the matter decided, and cannot be impeached on the ground of *informality* in the proceedings, or mistake or error in the matter on which they have adjudicated." *Raborg vs. Hammond*, 2 *H. & G.*, 50.

On the subject of trusts, administrations, &c., when the question of appointment arises incidentally in other courts, it is not competent there to inquire, whether rightfully appointed or not. And it becomes then unnecessary here to decide the correlative question, whether a party could or could not apply for the benefit of the insolvent laws, in any other county, than the one in which he resides; which must depend upon the provisions and the true construction of the acts themselves. And upon this construction the occasion is not now presented to express an opinion. In every view of the case therefore, the decree of the chancellor must be affirmed.

DECREE AFFIRMED.